**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARIANNE NIMMERRICHTER, for** | ) | |
| **LIBOR NIMMERRICHTER, deceased,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 12 C 4267** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **CAROLYN COLVIN[1], Commissioner** | ) | |
| **of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Following several unsuccessful suicide attempts, the plaintiff, Libor Nimmerrichter, finally took his own life on January 28, 2009. His widow, Mari, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying Libor's application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2). Mrs. Nimmerrichter asks the court to reverse the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

## PROCEDURAL HISTORY

Mr. Nimmerrichter applied for DIB on January 17, 2008, alleging that he had become disabled on September 1, 2003 due to back and neck pain and major depression. (Administrative Record ("R.") 252-57). Prior to that, he worked for essentially his entire adult life as a union

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for Michael J. Astrue as the appellee.

painter. (R. 287, 298). Mr. Nimmerrichter could no longer work in 2003. He suffered back and neck injuries in a motor vehicle accident in July 2003 (R. 536), which apparently had been a suicide attempt. (R. 40, 81). A second attempt followed shortly thereafter, this time by way of an overdose of prescription drugs. After being discharged from treatment for that, Mr. Nimmerrichter then made another attempt on his own life by turning the gas valve on and trying to hang himself. (R. 441, 444). Three years later, around the time of his father's death, he again tried to kill himself with a drug overdose. (R. 41, 1165). Finally, as already noted, he succeeded in taking his own life with a pain-killer overdose in January 2009. (R. 290).

Thereafter, Mr. Nimmerrichter's application for DIB was initially denied on April 9, 2008, and on reconsideration on July 11, 2008. (R. 108-09, 116-25). His attorney requested an administrative hearing and one was finally held on June 22, 2010, over a year after Mr. Nimmerrichter's suicide. Mrs. Nimmerrichter, represented by counsel, appeared before Administrative Law Judge, Joel Fina, and testified. (R. 72-107). A vocational expert also appeared and testified. A supplemental hearing was convened on August 17, 2010, at which a vocational expert and a medical expert testified. (R. 34-71). On September 23, 2010, the ALJ determined that Mr. Nimmerrichter was disabled for the beginning with his 50th birthday on February 28, 2008, until his death in January 2009. (R. 16-31). Prior to that, the ALJ felt that Mr. Nimmerrichter could have performed sedentary work, including jobs such as office clerk and surveillance system monitor. (R. 26-27).

This became the final decision of the Commissioner when the Appeals Council denied Mrs. Nimmerrichter's request for review of the decision on March 30, 2012. (R. 1-4). *See* 20 C.F.R. §§ 404.955; 404.981. She has appealed that decision to the federal district court under 42 U.S.C. §

405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE

### A.
### The Medical Evidence

Mr. Nimmerrichter was thwarted by his back and neck and his depression. As for his back and neck, x-rays from LaGrange Memorial Hospital on October 1, 2003 showed multiple levels of degenerative disease in the cervical spine. There was foraminal osteophyte encroachment, greater on the left than right, as well as significant narrowing of the central spinal canal, most notably at the C6-7 level. In the lumbar spine, again, there were multiple levels of disc and facet degeneration, including a small to moderate-sized disc herniation toward the left side at the L4-L5 level with disc herniation material migrating inferiorly on the left side, into the lateral recess of L5, effacing the left S1 nerve root. (R. 535-36). Based on these findings, Mr. Nimmerrichter's treating physician and pain specialist, Dr. Ira Goodman, diagnosed cervical radiculopathy, cervical discogenic pain and lumbar facet arthroplasty. He treated Mr. Nimmerrichter with a series of translaminar epidural steroid injections. (AR 541).

After the injections were completed, Mr. Nimmerrichter had a cervical myelogram at Hinsdale Hospital in January 2004. The test showed moderate central spinal stenosis at C6-7 and milder central spinal stenosis at C5-6. There was truncation of the nerve sheath exiting the right neural foramina C5-6, as well as diminished filling of the nerve sheath exiting the C6-7 foramina bilaterally. At C5-6, hypertrophic and degenerative changes were apparent, resulting in severe right foraminal stenosis and mild left foraminal stenosis. At C6-7, there was right central disk protrusion

which in conjunction with posterior endplate spurring, causing mass effect on the ventral thecal sac and flattening of the spinal cord, which resulted in moderate to severe central spinal canal stenosis. At C7-T1, hypertrophic and degenerative changes were demonstrated within the facet joints bilaterally. (R. 531-532). Diagnosis was: (1) moderate to severe central spinal stenosis and posterior endplate spurring and broad-based bulging annulus C5-6, resulting in mild central spinal stenosis, and (2) severe degenerative changes were demonstrated within the right uncovertebral joint, resulting in severe right-sided foraminal stenosis. (R. 532).

In February 2004, An EMG of the cervical spine revealed chronic, moderate radiculopathy at C6 and ongoing denervation. There was also chronic, severe median neuropathy of the right wrist, and chronic, mild neuropathy of the left wrist with ongoing denervation. (R. 528).

A radiological evaluation demonstrated disc space narrowing, endplate sclerosis and anterior spurring and multiple levels in the thoracic and lumbar spines. (R. 828). For years thereafter, plaintiff continued to experience pain in the neck and back. Dr. Goodman, continued to treat plaintiff for pain caused by these cervical and lumbar conditions. Steroids injections did not provide extended relief. He had good days and bad days. On bad days, his pain was 9/10. However, with attempts at work activities, his pain was consistently 10/10; it was the same with attempting to sleep. (R. 539-52; 5623-625; 744-776). Radiofrequency lesioning was also attempted, with similar results. (R. 553, 726-37, 740).

This long-term back and neck pain were coupled with Mr. Nimmerrichter's severe depression. There was the suicide attempt and hospitalization in July 2003. (R. 435-437). About two weeks after he was treated and released in stable condition, he tried to hang himself and also left the gas valve on. (R. 441, 444). He was admitted to Hinsdale Hospital and spent more than a

4

week there. (R. 444-45). Mr. Nimmerrichter then came under the care of Dr. Akram Razzouk, who became his treating psychiatrist. (R. 417-25). Mr. Nimmerrichter attempted to take his own life yet again, by overdose, in 2006. (R. 1165).

In June 2008, about six months before Mr. Nimmerrichter finally succeeded in taking his own life, Dr. Razzouk completed a Medical Source Statement detailing the nature and severity of his patient's mental impairment. (R. 869-875). The psychiatrist determined that Mr. Nimmerrichter's ability to complete a normal workday and workweek without interruptions from psychological symptoms and to perform at a consistent pace was markedly limited. Mr. Nimmerrichter was also moderately limited in his ability to: maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination or proximity to others without being unduly distracted by them; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; travel in unfamiliar places and use public transportation; set realistic goals and make plans.

Based on his extensive dealings with Mr. Nimmerrichter over the previous five years, Dr. Razzouk determined that he had "substantial losses" regarding his ability to respond appropriately to supervision and co-workers; the impairment had its onset in 2003; and the depression had been at this level of severity for at least 12 months. In explaining his assessment, he related that plaintiff had episodes of "severe depression," had several psychiatric hospitalizations and had attempted suicide in serious ways. Noting that plaintiff's physical pain was an additional factor limiting his

ability to work, Dr. Razzouk concluded that "the physical and psychological demands of a job, dealing with employer expectations, co-workers, changes, deadlines, etc. increase his risk for relapse." (R. 869-875). Seven months later, Mr. Nimmerrichter was dead as a result of an oxycodone overdose. (R. 93-94, 290).

The Social Security Administration arranged for a consultative psychiatric exam with Dr. Herman P. Langner in March of 2008. Dr. Langner reported that Mr. Nimmerrichter had related a long history of depression, heard voices, had previously attempted suicide and had multiple psychiatric hospitalizations. Dr. Langner's diagnostic impression was depression NOS. He determined that Mr. Nimmerrichter's GAF was seriously restricted at 45.[2] (R. 823-26).

The Social Security Administration's nonexamining consultative psychologist completed a Psychiatric Review Technique form ("PRTF"). (R. 834-846). The reviewing psychologist felt that Mr. Nimmerrichter's condition caused mild limitations in daily activities, moderate limitations in his ability to maintain social functioning, maintain concentration, persistence and pace, and resulted in 1-2 episodes of extended decompensation. He concluded that plaintiff did not meet the "C" criteria of the Listings of Impairments. (R. 844)

## B.

## The Administrative Hearing Testimony

## 1.

## Mrs. Nimmerrichter's Testimony

Mari Nimmerrichter described the physical limitations her husband suffered prior to his death. Due to pain in his neck and back, he could not lift, bend or stand. After he sat for more than

---

[2] A GAF (Global Assessment of Functioning) score of 45 denotes serious psychological symptoms like suicidal ideation or serious impairment of functioning. www.gafscore.com

10-15 minutes, he would have to lie down during the day. The pain was constant. He did not sleep well during the night. He would fall asleep throughout the day. He was always miserable. He did not eat with the family. In 2003, Mr. Nimmerrichter obtained some relief from pain medications or a series of steroid injections. But, the relief was temporary and soon the same situation would recur. (R. 84-85). He also went to physical therapy (R. 88), but he felt that it was made worse. Pain shot down his legs, and he would not continue. (R. 89). Mari said that because of massive pain in his back, plaintiff was unable to continue to work. (R. 96).

After Mr. Nimmerrichter's initial suicide attempt in 2003, he was taken to the psychiatric ward. He was diagnosed with depression. He was hospitalized three times for major depression. He tried therapy, group therapy, and a psychiatrist. (R. 81). He took Effexor and Seroquel for depression. (R. 82). In the beginning, he was more optimistic and apt to try things and follow a regimen. But, progressively, the depression worsened. (R. 88). He was completely disorganized and sometimes missed doctors' appointments. (R. 87). Mari also testified that her husband's relationship with her and their children changed after 2003. (R. 82). He was short with them, did not have patience and could not focus. He stopped participating in family activities and did not take care of things around the house. (R. 82). He did not go grocery shopping, and would not go to school functions; when he did go, he was not well behaved and was disruptive. (R. 83). When Mari would do things with the children, her husband wouldn't come along. (R. 86). He did not engage with anyone and was isolated. Mari had to remind him to take his depression medications. (R. 86).

## 2.
## The Medical Experts' Testimony

Psychologist Kathleen O'Brien testified at the supplemental hearing as a medical expert. She had not been at the initial hearing at which Mrs. Nimmerrichter testified about her late husband. (R.

72, 47). She had not seen any records of his psychiatric hospitalizations. (R. 39, 40, 47). She may have skimmed some of them when the hearing went off-record for a brief period. (R. 40). Others she had not seen at all. (R. 47). Nevertheless, Ms. O'Brien felt she could advance an opinion on Mr. Nimmerrichter's condition. She said he had severe depression, but that it did not meet the listings. (R. 42). She indicated that his suicide attempt in 2003 constituted a period of decompensation, but that afterward, with treatment and medication, Mr. Nimmerrichter "bouc[ed] back very nicely." (R. 42). She acknowledged that he attempted to take his life in January 2006, but again, recovered and was able to travel to Europe. (R. 43). Essentially, Ms. O'Brien felt there were two episodes of decompensation, and there was recovery within a year following each. (R. 43). She added that there was no indication that Mr. Nimmerrichter's depression met the listings – *i.e.*, disabling *per se* – in the year prior to that. (R. 43).

Ms. O'Brien went on to explain that Mr. Nimmerrichter would have been able to perform simple, unskilled tasks and there was no indication that he had any difficulty dealing with people other than his family. (R. 43). He would have been only mildly restricted in daily activities, mildly limited in concentration, moderately restricted in social functioning. (R. 44). He would benefit from a lower level stress environment where he wasn't expected to perform at above-average productivity standards. (R. 45). More specifically, she thought Mr. Nimmerrichter would have been moderately restricted in his ability to concentration and pace, carry out detailed instructions, and complete a normal work week. (R. 53). Yet, she also testified that there is nothing to indicate that Mr. Nimmerrichter would have been absent from work on a regular basis, aside from his hospitalizations following his suicide attempts. (R. 44).

**3.**
**The Vocational Expert's Testimony**

Next, Reuben Luna testified as a vocational expert. The ALJ asked whether a person would could perform light work, but only occasionally climb, balance, stoop, crouch, kneel, or crawl, and who was limited to simple, routine, repetitive tasks with no enhanced production requirements could perform Mr. Nimmerrichter's past work as a painter. The answer was no. (R. 61). Such a person could, however, handle jobs like garment packager or routing clerk. (R. 62). If the capacity for work were reduced to light, the person could perform the job of office clerk or surveillance monitor. (R. 62). Mr. Luna added that, such jobs would only tolerate one absence per month. (R. 63). If the person had a moderate limitation in the capacity to complete a work week, such jobs would be unavailable. (R. 67).

**D.**
**The ALJ's Decision**

The ALJ found that Mr. Nimmerrichter suffered from the following severe impairments: major depressive disorder; degenerative disc disease of the lumbar spine; degenerative disc disease of the cervical spine. (R. 23). The ALJ next determined that he did not have an impairment or combination of impairments that met or equaled a listed impairment. (R. 23). He specifically found that Mr. Nimmerrichter's depression did not meet or equal listing 12.04, and his back and neck impairments did not meet listing 1.04. (R. 23). The ALJ based his conclusions on the opinions of the state agency physicians who reviewed the medical evidence and on the testimony of the medical expert. (R. 23). Relying on the medical expert's testimony, the ALJ determined that Mr. Nimmerrichter's depression was no more than mildly limiting in the areas of daily activities, social functioning, and maintaining concentration. (R. 23). He experienced one to two episodes of decompensation. (R. 23).

9

The ALJ went on to determine that Mr. Nimmerrichter had the residual functional capacity to perform sedentary work, except that he could only occasionally crawl, climb, balance, stoop, crouch or kneel. He was further limited to performing just simple, routine, repetitive tasks. (R. 23). The ALJ then summarized the medical evidence. He noted that Mr. Nimmerrichter underwent varying degrees of treatment for his neck and back pain, including epidural injections and radiofrequency lesioning. The ALJ reported that these treatments were successful and that Mr. Nimmerrichter felt well enough to apply for a job at Home Depot, work as a camera man for a local cable show, and take a trip to Nashville. (R. 24). As for Mr. Nimmerrichter's mental status, the ALJ was impressed by positive progress notes from November 10, 2003, March 1, 2004, November 21, 2005, and February 2006. (R. 24-25). While the ALJ noted that Mr. Nimmerrichter was deceased, he (astonishingly) did not acknowledge that this was the result of suicide or that he had made attempts prior to taking his own life. As a result, the ALJ concluded that Mr. Nimmerrichter was never precluded from working for the required twelve continuous months. (R. 25). The ALJ did not mention the testimony of Mr. Nimmerrichter's widow nor the statements regarding restrictions on activities Mr. Nimmerrichter had completed during his application process.

The ALJ then considered the vocational evidence. Once Mr. Nimmerrichter reached age 50, the Medical-Vocational Guidelines directed the conclusion that he was disabled. At that age, he could not be expected to make vocational adjustments and learn new types of work. (R. 26-27). Prior to that, the ALJ relied on the vocational expert's testimony to find that Mr. Nimmerrichter could perform sedentary work that existing in significant numbers in the regional economy. Examples of such jobs were office clerk, and surveillance system monitor. (R. 26). Accordingly, the ALJ found that Mr. Nimmerrichter was not disabled prior to February 28, 2008, but disabled

10

thereafter.  (R. 27).

# IV.
# DISCUSSION

## A.
## The Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one.  The court must affirm the decision if it is supported by substantial evidence.  42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The court may not reweigh the evidence, or substitute its judgment for that of the ALJ.  *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009);  *Berger*, 516 F.3d at 544.  Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts.  *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008);  *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).  Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings.  *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision.  *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  An ALJ is required to "minimally articulate" the reasons for his decision.  *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion.  *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ's decision must allow

the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). It's also called a "lax" standard, *Berger*, 516 F.3d at 544.

## B.
## The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## Analysis

12

**1.**

Mrs. Nimmerrichter points to a trilogy of Seventh Circuit cases that charge that many of the Social Security Administration's ALJ's are poorly informed about mental illness. *See Martinez v. Astrue*, 630 F.3d 693, 694 (7th Cir. 2011); *Spiva v. Astrue,* 628 F.3d 346, 348 (7th Cir.2010); *Parker v. Astrue,* 597 F.3d 920 (7th Cir.2010). This case is another and conspicuous example of that failing.[3] Here, at least, the ALJ sought out the advice of a medical expert. But that did not improve things. The medical expert's testimony in this case was, at best, unconvincing and, at worst, farcical. She did not review all the medical evidence, most significantly, records of Mr. Nimmerrichter's hospitalizations following all his suicide attempts. She rather cavalierly stated that, after each suicide attempt, Mr. Nimmerrichter "bounced back very nicely."

This conclusion is staggering in its absurdity: just a couple of weeks after treatment following his first attempt in 2003, he tried to kill himself again – with prescription drugs. He tried yet again after that by turning on the gas and trying to hang himself. He clearly did not recover for a year between attempts as the medical expert suggested – the first two attempts were separated by a matter of days. The third came not long afterward. Then, he made two more attempts in the next three or four years. On the second one, he was successful. To say that he "bounced back nicely" is offensive and indicates a disregard or indifference to the facts that happily is seldom seen in these cases.

Ms. O'Brien, the medical expert, didn't listen to Mrs. Nimmerrichter's testimony, nor did she read Mr. Nimmerrichter's statements regarding his symptoms and restrictions on his activities

---

[3] This case makes one wonder at the restraint the Seventh Circuit has exercised in its past criticisms of the Commissioner's treatment of psychologically impaired claimants. *See Punzio*, 630 F.3d at 710; *Spiva,* 628 F.3d at 348; *Parker,* 597 F.3d at 924–25. Although, it should be said that this case goes far beyond those.

and ability to work. She ought to have because she might have learned some things about his condition. For example, his trip to Europe was not a pleasure trip or an example of bouncing back. Mr. Nimmerrichter was born in Slovakia. When his father died in the old country, it affected him badly. As Mrs. Nimmerrichter put it:

> he was very, he was very torn up about his dad dying. He was shaky, he was not in good shape. So his sister – but he wanted to go to the funeral, well his sister flew up to Chicago because I did not want him to get on a plane by himself I didn't think he'd make it to the other end. I was just afraid that he would do something or, you know, he would get into an altercation or something like that with someone because of his mood and everything like that. So she came up, she flew with him there to his dad's funeral. She said it was a crazy flight because he couldn't sit in the seat, you know, the flight attendants were getting frustrated with him, you know . . . .

(R. 92).

The ALJ cut Mrs. Nimmerrichter off there, ostensibly because her testimony was hearsay. Not only was this not by any stretch hearsay, but the rules of evidence do not apply at administrative hearings before ALJs. 42 U.S.C.A. § 405(b)(1)("Evidence may be received at any hearing before the Commissioner of Social Security even though inadmissible under rules of evidence applicable to court procedure."); *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 788 (7th Cir. 1997)(hearsay admissible); *Keller v. Sullivan,* 928 F.2d 227, 230 (7th Cir.1991) (hearsay statements admissible before ALJ if relevant and material). Of course, had the ALJ applied the appropriate standards of admissibility for the forum, it wouldn't have mattered because the medical expert never considered the testimony. And neither did the ALJ – more on this later.

It would seem that, in cases involving mental illness – especially to such a severe degree that it ends in suicide – that a medical expert would take a glance at the claimant's statements and those of his widow. In most, if not all, such cases, the medical experts are present at the hearing. That

14

was not the case here. Mental health cases are different than physical ailments. There are no MRIs, x-rays, or EKGs to paint a picture of the mentally impaired claimant's condition. Mental health professionals can only learn about their patients by observation and dialog. Hence, what they say about how they feel is extremely important. It was ignored in this case.

Clearly, the medical expert's opinion was fatally flawed – and perhaps to a degree unparalleled in these cases. Mr. Nimmerrichter didn't "bounce back nicely" after each suicide attempt, contrary to the medical expert's testimony. Nor did he have a year of "remission" following his first attempt. He tried to kill himself again two weeks after treatment. He was not taking pleasure trips abroad. All these flaws doom the ALJ's opinion, because he relied on a medical expert whose conclusions in this case were patently flawed, to find that Mr. Nimmerrichter was not disabled prior to his 50th birthday. As a result, the ALJ's opinion is not supported by substantial evidence.

While Fed.R.Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) do not apply to these proceedings, what Judge Easterbrook said about medical expert testimony in these cases bear mention here:

> Rule 702 of the Federal Rules of Evidence provides that "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." This substantially codifies the holdings of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,...* and its successors. Rule 702 does not apply to disability adjudications, a hybrid between the adversarial and the inquisitorial models. ...But the idea that experts should use reliable methods does not depend on Rule 702 alone, and it plays a role in the administrative process because every decision must be supported by substantial evidence. Evidence is not "substantial" if vital testimony has been conjured out of whole cloth.

*Donahue v. Barnhart,* 279 F.3d 441, 446 (7th Cir.2002). It may be said, as well, that evidence is not

substantial where, as here, vital testimony and evidence have been ignored.

**2.**

But there are additional problems with the ALJ's opinion. Although he uncritically accepted the medical expert's opinion, his hypothetical to the vocational expert – the hypothetical that reflected his residual functional capacity determination – did not reflect the limitations the medical expert did find Mr. Nimmerrichter to have. The medical expert testified that Mr. Nimmerrichter would be moderately limited in his ability to complete a work week. (R. 53). Clearly, if someone is moderately restricted in their capacity to show up for a full week, it would be difficult to hold down a job. Not surprisingly, the vocational expert testified that this was the case. (R. 67). The types of jobs Mr. Nimmerrichter might be able to perform would tolerate just one absence per month. (R. 63). *See Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011)(ALJ required to make moderate limitation in ability to complete a normal workweek part of his hypothetical to vocational expert).

Despite adopting the medical expert's opinion, the ALJ excised this limitation – a significant one in the vocational expert's eyes – from it without explanation. This he could not do. He had to give good reasons for rejecting this portion of the medical expert's opinion. 20 CFR §1527(d), (f); *Goble v. Astrue*, 385 Fed.Appx. 588, 593 (7th Cir. 2010); *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009). Moreover, he was not allowed to cherry-pick the parts of the medical expert's testimony that supported his finding of no disability and ignore the part that didn't. *Myles v. Astrue,* 582 F.3d 672, 678 (7th Cir.2009).

**3.**

The ALJ also rejected the opinion of Dr. Razzouk, Mr. Nimmerrichter's treating psychiatrist.

He did so rather tersely, saying that "based on the totality of the evidence, there is nothing to show that [Mr. Nimmerrichter] was ever precluded from any substantial gainful activity within the above-cited parameters for the requisite 12 continuous months." (R. 25). For the ALJ, the "totality of the evidence" consisted of five positive treatment notes over the course of the last six years of Mr. Nimmerrichter's life. (R. 24-25). This is a prime example of what the Seventh Circuit was talking about in cases like *Martinez* and *Spiva*. The court has explained time and again that "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about h[is] overall condition." *See Punzio v. Astrue*, 630 F.3d 704, 710 (7ᵗʰ Cir. 2011); *Larson v. Astrue,* 615 F.3d 744, 751 (7ᵗʰ Cir.2010); *Kangail v. Barnhart,* 454 F.3d 627, 629 (7ᵗʰ Cir.2006).

The few snapshots the ALJ focused on here are overwhelmed by an album of snapshots that depict a deeply troubled individual struggling to understand his inability to function as he once had. The ALJ was able to find five positive treatment notes, but he ignored page after page of negative treatment notes. (R. 421-23, 431-37, 483-506, 513, 926, 932, 936, 1214, 1218-19).[4] Incredibly, the ALJ made no mention of Mr. Nimmerrichter's repeated suicide attempts and his hospitalizations for treatment. One would think that repeated suicide attempts would be a significant piece of evidence if the case of an individual applying for DIB on the basis of major depression. If, as the ALJ touted, Mr. Nimmerrichter had a GAF score of 60 on February 17, 2006 (R. 25, 930), what was his GAF score during these suicidal periods? We know that on March 12, 2008, the Social Security Administration's own consulting psychiatrist assigned Mr. Nimmerrichter a seriously restricted

---

[4] Due to the voluminous medical record – over 800 pages – a few of these notes might be duplicates. But, suffice it to say, even so, the negative far outweighs the positive in this case.

score of just 45. (R. 825). But the ALJ ignored that, too.

An ALJ doesn't have to mention every piece of evidence in the record, he cannot ignore lines of evidence that are contrary to his conclusion the way the ALJ did here. *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012); *Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir.2010); *Simila v. Astrue,* 573 F.3d 503, 516 (7th Cir.2009). And while the "totality of the evidence" might be a valid reason in some cases to reject a treating physician's opinion, *Scott v. Astrue,* 647 F.3d 734, 739 (7th Cir.2011); *Punzio v. Astrue,* 630 F.3d 704, 710 (7th Cir.2011); *Ketelboeter v. Astrue,* 550 F.3d 620, 625 (7th Cir.2008), the ALJ here gives no indication that he knew what the totality of the evidence was. Moreover, it should be noted that the non-examining medical expert's opinion alone cannot serve as a reason for rejecting the treating psychiatrist's opinion. *Gudgel v. Barnhart,* 345 F.3d 467, 470 (7th Cir.2003).

**4.**

Then there is the ALJ's credibility determination: or more precisely, the one he didn't perform. He said he had to make a credibility determination and he gave a brief summary of the evidence – including his severely truncated seven-paragraph discussion of the psychological evidence – and, for his coda, then invoked the all too familiar boilerplate that ALJs in Social Security cases, at least in this district, obdurately insist on repeating in direct violation of the repeated repudiations from the Seventh Circuit:

> After careful consideration of the evidence, the undersigned finds hat the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant[sic] allegations concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment established above.

(R. 25).

18

The use of this formula is one of the Seventh Circuit's most often voiced complaints about ALJs' opinions. *See Spiva*, 628 F.3d at 348. The Court has criticized it as "opaque," "meaningless," and "unsustainable." *see Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013) *Mueller v. Colvin*, 2013 WL 1701053, 3 (7th Cir. 2013); *Bjornson v. Astrue,* 671 F.3d 640, 645 (7th Cir.2012); *Parker v. Astrue,* 597 F.3d 920, 922 (7th Cir.2010). And yet its use by ALJs persists unabated, as this case shows. Nonetheless, the Court of Appeals has held that it will not scuttle a decision so long as the ALJ does provide specific reasons for disbelieving a claimant's testimony. *See Mueller*, 2013 WL 1701053, 3; *Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir.2012); *Shideler v. Astrue,* 688 F.3d 306, 312 (7th Cir.2012).

Here, the ALJ did not mention Mr. Nimmerrichter's allegations or alleged symptoms. He did not address Mrs. Nimmerrichter's description of her husband's daily life before he died. As such, the ALJ violated not only caselaw, but the Social Security Administration's own ruling on the topic. *See* SSR 96-7p, 1996 WL 374186, 4 ("It is not enough to make a conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible."). The ALJ did not, as he is required, discuss Mr. Nimmerrichter's daily activities. *See* SSR 96-7p, 1996 WL 374186, 3-4; *Filus,* 694 F.3d at 869. According to his statements and his widow's testimony, his activities were severely restricted and certainly not what they once were as he had lost interest in life. The ALJ did not, as he is required, discuss Mr. Nimmerrichter's medication regimen. *See* SSR 96-7p, 1996 WL 374186, 3-4; *Filus*, 694 F.3d at 869. Mr. Nimmerrichter was taking narcotic pain relievers and pychotropic drugs, as well as seeking relief through epidurals and radiofrequency lesioning, suggesting that he wasn't faking his symptoms and

19

perhaps not exaggerating to the extent the ALJ assumed.[5]  *See Diaz v. Prudential Ins. Co. of Am.,*
499 F.3d 640, 646 (7th Cir.2007); *Carradine v. Barnhart,* 360 F.3d 751, 755 (7th Cir. 2004).

      In the end, all the ALJ did, as already noted, was summarize the medical evidence, and he
did a woefully inaccurate job of that.  To the extent the ALJ's efforts could be termed a credibility
determination, it was "patently wrong."  *See Mueller v. Colvin*, 2013 WL 1701053, 3 (7th Cir.
2013)(ALJ's credibility determination could not stand where he merely recited medical records and
did not explain how they were inconsistent with claimant's allegations).

## 5.

      The Commissioner attempted to salvage this wreck in her brief, but in doing so, came up
with reasoning that the ALJ did not employ.  For example, the Commissioner submits that the ALJ
could reject the opinion of Mr. Nimmerrichter's treating psychiatrist because it conflicted with the
findings of a state agency psychiatrist and a state agency psychologist.  This is flimsy reasoning, *see*
*Gudgel,* 345 F.3d at 470, but more importantly, it's not the reasoning the ALJ supplied and thus it
is not available to the Commissioner. *Roddy,* 705 F.3d at 637. This is yet another instance of the
Commissioner's intentionally and repeatedly violating the *Chenery* doctrine. *Hughes v. Astrue*, 705
F.3d 276, 279 (7th Cir. 2013)("Characteristically, and sanctionably, the government's brief violates
the *Chenery* doctrine.").[6]  It is difficult to insist that plaintiff's lawyers adhere to the rules when the
Government ignores them by routinely violating  the *Chenery* doctrine.  The Government's non-

---

    [5] The ALJ did mention the latter two methods but, despite the fact that they were required repeatedly,
equated them with successful control of Mr. Nimmerrichter's symptoms.  (R. 24).

    [6] One of  the three common criticisms by the Seventh Circuit about the handling of social security
disability claims is that "the government's lawyers ... often rely heavily on evidence not (so far as appears)
relied on by the administrative law judge, and defend the tactic by invoking an overbroad conception of
harmless error." *Spiva*, 628 F.3d at 348 (parenthesis in original).

compliance invites and encourages noncompliance with other rules by counsel against whom the Commissioner litigates. *Compare Olmstead v. United States*, 277 U.S. 438, 485 (1928)(Brandeis, J., dissenting).

**6.**

Mr. Nimmerrichter's physical impairments – and the ALJ's treatment of them – have not even been addressed. And they need not be. It is enough at this point in the review that herniated discs and radiculopathy combined with his severe depression, all feeding into each another. (R. 875). Not surprisingly, a man who had worked consistently his whole adult life – work his wife said he enjoyed – suffered even more depression when he could no longer physically do what he once could. Furthermore, the fact that the pain was such that Mr. Nimmerrichter, repeatedly suicidal, had to take oxycodone to relieve it contributed to tragedy – he overdosed on that medication to end his life.

How could an ALJ ignore pages of evidence, including hospitalizations for suicide attempts and a successful suicide, while focusing on a few snippets of evidence pertaining to days when Mr. Nimmerrichter felt better or was in a good mood? How could a "medical expert" conclude under the facts of this case that Mr. Nimmerrichter had "bounc[ed] back nicely" following one or more of the unsuccessful suicide attempts? (The fifth attempt was successful). How could both the ALJ and the medical advisor upon whom the ALJ relied so completely ignore Mr. Nimmerrichter's statements and his widow's testimony? How could the ALJ, having adopted the medical expert's opinion, discard, without comment, the most significant limitation she found and one that the vocational expert testified would preclude unskilled work? It is difficult to imagine; but that is exactly what happened. Nonetheless, the record demonstrates that the only possible outcome in this case is a finding that Mr. Nimmerrichter was disabled. *Punzio*, 630 F.3d at 713.

If the ALJ had considered all the evidence, as he should have, including Mr. Nimmerrichter's statements and Mrs. Nimmerrichter's testimony, Seventh Circuit precedent would still have precluded him from determining that a few good treatment notes trumped pages of pessimistic treatment notes and genuine suicide attempts. *Punzio*, 630 F.3d at 710; *Larson v. Astrue,* 615 F.3d 744, 751 (7th Cir.2010); *Kangail,* 454 F.3d at 629. And, even if the medical expert's opinion were acceptable, Seventh Circuit precedent still would have required the ALJ to accept the vocational expert's testimony that a moderate limitation in the capacity to complete a normal workweek would mean Mr. Nimmerrichter was disabled. *Simila,* 573 F.3d at, 520–21; *Young v. Barnhart,* 362 F.3d 995, 1004 (7th Cir. 2004).

**7.**

Mrs. Nimmerrichter asks that, rather than being remanded for further proceedings, this case simply be reversed and benefits awarded. In the approximately 100 (reported and unreported) Social Security disability cases I have reviewed in the eight years I've been on the bench, I have never granted such a request, and I don't consider it cavalierly. An award of benefits without remand, although permissible, 42 U.S.C. 405(g); *Gilliland v. Heckler,* 786 F.2d 178, 184 (3d Cir. 1986); *Lindner v. Sullivan,* 902 F.2d 1263, 1266 (7th Cir.1990), is something that is not "normally" done. *Mueller v. Astrue*, 493 Fed.Appx. 772, 777 (7th Cir. 2012). But this case is "a good candidate for such an action," *id.*, since "under the correct standard the result is foreordained." *Holler v. Barnhart*, ,102 Fed.Appx. 742, 745 (3d Cir. 2004).

Accordingly, the Commissioner's decision is reversed, and this case is remanded to the Commissioner for an award of benefits from Mr. Nimmerrichter's alleged onset date of September 1, 2003.

22

**8**.

Mrs. Nimmerrichter also asks for an immediate award of attorney's fees. This is best decided after the Commissioner has an opportunity to respond. Although, it is difficult to see how that response could overcome the outrageously flawed opinion in this case and somehow show that the government's position was substantially justified. Ignoring significant evidence of disability, *Bassett v. Astrue*, 641 F.3d 857, 860 (7th Cir. 2011); *Golembiewski v. Barnhart*, 382 F.3d 721, 724 (7th Cir. 2004), failing to discuss a claimant's credibility, *Goliembewski*, *supra,* errors regarding the hypothetical to the vocational expert, *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009), and the Commissioner's violation of the *Chenery* doctrine, *Bassett*, *supra*, have all been deemed by the Seventh Circuit to provide a basis to award fees. But the Commissioner should have the opportunity to respond.

## CONCLUSION

The plaintiff's motion for remand for an award of benefits [Dkt. #11] is GRANTED, and the Commissioner's motion for summary judgment is DENIED. The Commissioner's decision is reversed, and this case is remanded to the Commissioner for an award of benefits from Mr. Nimmerrichter's alleged onset date of September 1, 2003. The plaintiff should file her application for fees within 21 days. The Commissioner shall have 14 days after that filing to respond. The parties are reminded that petitions for fees, and opposition to them, must comply with Local Rule 54.3. There will be no continuances of this schedule.

ENTERED: _____
                 UNITED STATES MAGISTRATE JUDGE

DATE: 11/14/13